UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JESSICA POLLARD, on behalf of herself and the putative class,<br><br>Plaintiff,<br><br>v.<br><br>AEG LIVE, LLC, AEG LIVE NJ, LLC, CONCERTS WEST,<br><br>Defendants. | Civil Action No. 14-1155 (SRC)<br><br>**OPINION** |

**CHESLER**, District Judge

This matter comes before the Court upon the motion filed by Defendants AEG Live, LLC, AEG Live NJ, LLC and Concerts West (collectively "Defendants" or "AEG") to dismiss the Third Amended Complaint ("TAC") for lack of standing and for failure to state a claim. Plaintiff Jessica Pollard ("Plaintiff" or "Pollard") has opposed the motion. The Court has considered the papers filed by the parties. For the reasons that follow, the Court will grant the motion to dismiss and will dismiss the TAC with prejudice.

**I.   BACKGROUND**

Plaintiff alleges that AEG, as a promoter in control of the sale and distribution of concert tickets, violated a provision of the New Jersey Consumer Fraud Act that prohibits withholding more than five percent of event tickets from sale to the general public (the "Ticket Law"). *N.J.S.A.* 56:8-35.1.[1] Pollard, on behalf of herself and a putative class,

---

[1] *N.J.S.A.* 56:8-35.1 states that "[i]t shall be an unlawful practice for a person, who has access to tickets to an event prior to the tickets' release for sale to the general public, to withhold those tickets from sale to the general public in an amount exceeding 5% of all available seating for the event."

1

claims that Defendants, customarily, through contractual obligations or otherwise, reserve tickets for industry insiders such as promoters, sponsors, and performers. The holds limit the number of face-value seats available to the public, forcing fans to pay inflated prices on the secondary market, where brokers resell some of the tickets from insiders who took the first cut. By way of example, Pollard cites a contract between AEG and Michael Jackson that gave AEG control over ticket sales and secondary ticket activities "in a first hold position." (TAC ¶ 6.)

Pollard claims that she was harmed by AEG's conduct when she bought tickets above face value to two New Jersey concerts, Bon Jovi's 2010 "The Circle" tour and Justin Bieber's 2013 "Believe Tour." The putative class includes attendees who overpaid and continue to overpay for these and perhaps thousands of other concerts promoted by AEG in New Jersey going back six years before the filing of this lawsuit.

## II. DISCUSSION

### a. Procedural History

The Third Amended Complaint is Plaintiff's second attempt to plead a plausible claim based on excessive withholding. To state a claim under the Consumer Fraud Act, a plaintiff must allege three elements: (1) unlawful conduct by the defendants; (2) ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss. *Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 557 (2009). In a previous Opinion and Order, dismissing the First Amended Complaint, the Court found that Plaintiff's allegations "upon information and belief," that "Defendants withheld more than 5% of tickets," did no more than parrot the statute and thus lacked adequate factual support. (Sept. 16, 2014, Op. ("Op.") at 10.)

The Court advised Plaintiff that she may satisfy the pleading requirements by alleging a manner of withholding or some practice of diverting tickets from the regular on-sale. (*Id.* at 11.) Those assertions, the Court cautioned, would still need sufficient factual underpinnings. (*Id.*)

Plaintiff supplemented her complaint with allegations of a pattern and practice of withholding. After Defendants answered the Second Amended Complaint, Plaintiff received leave for another amendment. Keeping the substantive claims largely intact, the TAC expanded the putative class from above-face-value purchasers of tickets to the Justin Bieber and Bon Jovi concerts, to all New Jersey concerts involving AEG in the preceding six years. Defendants filed a second motion to dismiss the TAC for failure to state a claim and also for lack of standing, initially, to bring claims of absent putative class members for events that Pollard did not attend.

Before Defendants filed their reply brief, the Third Circuit held in *Finkelman v. National Football League*, that plaintiffs alleging violations of the same New Jersey ticket statute in the distribution of Super Bowl tickets had no Article III standing because they failed to establish injury-in-fact or causation. 810 F.3d 187 (3d Cir. 2016). Where demand to attend an event vastly exceeded the supply of seats, the Court held that Finkelman was unable to trace the high ticket prices to withholding as distinct from the operation of ordinary market forces. *Id.* at 199. Relying on *Finkelman*, Defendants subsequently challenged Pollard's standing as to her own claims. Because standing is a jurisdictional issue, it can be raised at any time. *See CSX Transp. Co. v. Novolog Bucks Cty.*, 502 F.3d 247, 253 (3d Cir. 2007). *Finkelman* requires the Court to reexamine its previous conclusion that Pollard had sufficiently pled ascertainable loss and causation.

3

### b. Standing

Article III restricts a federal court's powers to hear only "cases or controversies," which means that a plaintiff must show that (1) she suffered an injury-in-fact, (2) the injury is fairly traceable to some action of the defendant and (3) the injury is capable of redress by the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). These three elements constitute "the irreducible constitutional minimum" of Article III standing. *Id.* at 560. The party invoking federal jurisdiction bears the burden of proving that standing exists. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998).

A plaintiff sets forth an injury-in-fact by showing an invasion of a concrete and particularized legally protected interest that is actual or imminent, not conjectural or hypothetical. *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 278 (3d Cir. 2014) (citing *Lujan*, 504 U.S. at 560). Causation exists if the alleged injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (quotation marks and alterations omitted). Finally, redressability requires a showing that "the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

The amount of support needed to sustain each prerequisite mirrors the threshold to satisfy any other burden at the particular state of the litigation. *Lujan*, 504 U.S. at 561. At the pleading stage, standing may be demonstrated based upon the complaint's well-pleaded factual allegations. *Id.* Speculative and conjectural statements, however, will not suffice. *Finkelman*, 810 F.3d at 194. If the named plaintiff cannot establish standing, the putative class action must be dismissed. *See Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353,

364-65 (3d Cir. 2015).

Pollard's alleged injury is the payment of a ticket price in excess of face value, under the theory that illegal withholding forces fans into the secondary market where they must pay a substantially higher price. *Finkelman* derived two possible theories of injury that could be inferred from the alleged misconduct, dismissing each in turn. The Court follows the roadmap laid out by *Finkelman*.

> i. *Theory One: AEG's Alleged Misconduct Prevented Pollard from Purchasing a Face-Price Ticket*

Under this interpretation, the TAC can be read to say that but for Defendants' withholding, Pollard would have been able to purchase tickets at face value. Finkelman's claim failed because he never made an attempt to buy tickets on the primary market before paying $2,000 for two seats with an $800 face price. *Finkelman*, 810 F.3d at 190. Before turning to the secondary market, Finkelman did not participate in a League-sponsored lottery, a prerequisite for an opportunity to procure a face-price seat, and consequently, had a zero percent chance of succeeding. *Id.* at 198. Pollard likewise does not plead that she tried to obtain tickets at the public on-sale before looking elsewhere, but states that she can amend her complaint to allege an attempt to get tickets at face price. Setting aside Defendants' contention that such language obfuscates the distinction between seeking tickets at the *general on-sale* and merely hoping to pay face value on the secondary market, even a proper attempt would not have established an injury traceable to any alleged withholding.

*Finkelman* illustrates the difficulty of causation in this case with an example:

> Imagine that there are ten people in line to attend a concert at a venue with only ten seats. It turns out, unbeknownst to the would-be ticket buyers, that the event organizer has

5

> violated the Ticket Law by withholding 50% of tickets for corporate insiders. The first five people in line are able to buy a ticket at face price, but just as the sixth person reaches the ticket counter, the clerk puts a "SOLD OUT" sign in the window and turns off the lights. The sixth person in line then (i) buys a ticket from one of the five insiders in the resale market at a price higher than face value, and (ii) sues the event organizer under the Ticket Law. She seeks, as damages, the difference between the face price of the ticket and the higher price she actually paid.
>
> In this scenario, our plaintiff should have no trouble alleging that she suffered an injury-in-fact fairly traceable to the defendant's conduct. But for the defendant's illegal withholding, our plaintiff—as the sixth person in line—would have been able to buy a ticket at face price.

*Id.* at 197. Under this hypothetical, the sixth through the tenth person in line lost an opportunity to buy one of the ten face-price tickets that would have been sold to the general public if no withholding occurred. Responsibility for the plight of the eleventh person, however, does not fall on the defendants. Even if no withholding occurred, she would have been out of luck because demand exceeded supply. Thus, the Third Circuit noted that:

> Unless Finkelman could allege facts indicating that . . . he was one of the 'next people in line,' demand for Super Bowl tickets so far exceeds supply that Finkelman's probability of obtaining a face-price ticket in a public sale would have been effectively nil regardless of the NFL's ticketing practices.

*Id.* at 199. Pollard encounters the same problem. The concerts at issue, she admits, are "some of the most popular and iconic concerts." (TAC ¶ 8.) Given this reality, "[a]ny argument that [she] could have procured a face-price ticket," at least on the facts alleged in the TAC, "is ultimately conjectural and speculative." *Finkelman*, 810 F.3d at 199. Such allegations cannot sustain Article III standing.

>    ii. *Theory Two: Pollard Paid a Higher Price on the Secondary Market Due to AEG's Withholding*

The second alternative posits that the effects of illegal withholding raise prices on the secondary market because withholding restricts the supply of face-value tickets available to the general public, which raises secondary demand. Pollard's injury would then be the difference between the resale price that would have existed in a market without withholding and the price she actually paid. *Id.* at 200. The Court accepted this causal link in its earlier Opinion. (Op. at 13.) *Finkelman* subsequently found it insufficient because such allegations focus on only one side of the equation and fail to account for insider resale behavior. *Finkelman*, 810 F.3d at 200. If secondary market demand commands a price above face value, an insider may be more motivated to take advantage of the profit opportunity than a fan eager to see the show. The result may increase the supply of tickets on the resale market and lower the price. *Id.* It is then "entirely possible that [Pollard] was able to buy a ticket for *less* money than if members of the general public had been able to purchase 95% of tickets in the first instance." *Id.* (emphasis in original). Thus, "we have no way of knowing whether the . . . withholding of tickets would have had the effect of increasing or decreasing prices on the secondary market. We can only speculate—and speculation is not enough to sustain Article III standing." *Id.* Pollard's complaint, like Finkelman's, is short on facts to amount to much more than saying: "I have a strong suspicion that this ticket would have been cheaper if more tickets had been available for purchase by members of the general public." *Id.* at 201. Article III standing does not arise from suspicions.

To remedy the standing defect, Pollard offers a declaration of an expert economist who opines that primary withholding raises secondary prices for several reasons. First,

7

according to the expert, as compared to a public-driven resale market, tickets resold by insiders are channeled through concentrated brokers whose market power allows them to demand a higher price. (Rascher Decl. ¶¶ 18-19.) Second, the expert highlights studies showing that resale, and thus secondary market supply, is higher for shows that distribute a higher portion of tickets in the primary market, and third, primary sale reduces excess demand. (*Id.* ¶¶ 20-22.) The higher supply and lower demand each force down the ticket price. (*Id.*) The Third Circuit, also offered expert testimony, stated that information outside the four corners of the complaint cannot cure standing, but remanded the case to the District Court for further proceedings, including to consider whether plaintiff should be granted leave to amend. *Finkelman*, 810 F.3d at 203. This Court does not need to decide whether this information could establish standing because amendment would be futile in light of Pollard's inability to state a claim even if she had standing.

### c. Rule 12(b)(6)

Defendants' motion to dismiss also argues that the TAC does not plead sufficient facts to show that withholding occurred. The Court agrees.

#### i. *Standard of Review*

As a threshold matter, Pollard claims that this case must proceed unless Defendants prove that "no material issue of fact remains to be resolved" because Defendants' answer to the SAC waived their ability to file a subsequent 12(b)(6) motion to dismiss the substantively identical TAC. (Pl.'s Br. at 10) (emphasis removed). Defendants' only avenue for relief at this procedural juncture, according to Pollard, is to move for judgment on the pleadings under a stricter standard of Rule 12(c). Not so. In amending the SAC, Plaintiff mooted AEG's answer, leaving AEG free to challenge the new complaint for

8

failure to state a claim under Rule 12(b)(6).

Plaintiff's advocacy for applying a different rule is also futile because the standard of review is identical. "When a Rule 12(c) motion alleges plaintiff's failure to state a claim upon which relief can be granted as here," courts "analyze the motion under the same standard as a Rule 12(b)(6) motion to dismiss." *Ober v. Brown*, 105 F. App'x 345, 346 (3d Cir. 2004) (citing *Turbe v. Gov't of Virgin Islands,* 938 F.2d 427, 428 (3d Cir. 1991)). Plaintiff's complaint must contain "sufficient factual allegations," which would "'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)); *Rose v. Bartle*, 871 F.2d 331, 342 (3d Cir. 1989). The court must accept all factual allegations in the complaint as true and draw all inferences in favor of the plaintiff. *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996); *Hlista v. Safeguard Props., LLC*, No. 15-1812, 2016 WL 2587986, at *1 n.4 (3d Cir. May 5, 2016). That obligation does not extend to legal conclusions couched as facts. *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, will not suffice." *Iqbal*, 556 U.S. at 678.

## ii. Sufficiency of Pleading

The Court found inadequate Plaintiff's earlier complaint alleging that Defendants withhold more than five percent of tickets and have deals with players in the secondary market to give brokers large blocks of tickets before they are offered for sale to the public. (Op. at 10.) The TAC recasts nearly the same threadbare assertions as a pattern and practice of wrongdoing, now stating that the "entertainment industry [has] a customary practice of withholding a percentage of tickets from public sale either through contractual obligations

9

or by way of habit and custom" to reserve them for "persons and groups such as event promoters, sponsors, performers, entertainment critics, celebrities and local dignitaries," some of who then resell the tickets to brokers who channel them to the secondary market. (TAC ¶¶ 4-5.)  As before, the Court remains in the dark about any actions taken by AEG to suggest more than a mere possibility of such conduct.

Plaintiff provides one contract from which she hopes to extrapolate a practice of withholding—an agreement with Michael Jackson that gave AEG control over ticket sales and secondary ticket activities "in a first hold position." (*Id.* ¶ 6.)  No factual allegations support that any withholding actually took place pursuant to that contract or, more importantly, that this conduct occurred or is illustrative of AEG's distribution practices in New Jersey.[2]  Defendants are "one of the world's largest producers and promoters of live tours and events for rock and pop superstars," (*Id.* ¶ 17), whose distribution schemes may vary by artist, venue, state, and country.  No facts give any reason to believe that this contract reflects a practice anywhere, yet alone in New Jersey, as opposed to a jurisdiction not governed by the Ticket Law under which Pollard's claims arise.

Pollard suggests that it is appropriate to relax pleading standards where a plaintiff's case hinges on information exclusively within the control of a defendant. *See In re Craftmatic Sec. Litig.*, 890 F.2d 628, 645 (3d Cir. 1989).  But even this safety valve does not excuse plaintiffs from stating supporting facts for their allegations. *Id.* ("even under a non-restrictive application of the [pleading rules], pleaders must allege that the necessary information lies within defendants' control, and their allegations must be accompanied by a statement of the facts upon which the allegations are based").  Additionally, Plaintiff's

---

[2] Defendants submit that the Michael Jackson concert was scheduled to take place in London but was cancelled. (Defs.' Br. at 5.)

averred difficulty obtaining necessary information is undermined by her access to the Michael Jackson contract. It is further belied by the success of plaintiffs in similar cases in learning about defendants' ticket distribution and/or withholding practices. *See Frost v. Live Nation Ent. Inc.*, 14-cv-2452, 2015 WL 4530533, at * 1 (Jul. 27, 2015) (alleging that defendants withheld tickets to three concerts in amounts of fifteen, eighty-four, and sixty-seven percent); *Finkelman*, 810 F.3d at 190 (describing NFL ticket distribution process that withholds ninety-nine percent of tickets from public sale).

For the second time, Pollard provides no facts to illustrate a New Jersey practice of withholding, without which, her allegations are conclusory and cannot survive a motion to dismiss. Plaintiff requests leave to amend, but even Rule 15's liberal standards favoring amendment do not require it where the amendment would be futile. *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002). The Court has no reason to believe that Pollard will successfully remedy her complaint if given a third chance. Accordingly, the Court will dismiss the TAC with prejudice.

### III. CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motion to dismiss and will dismiss the TAC with prejudice. An appropriate Order will be filed.

    s/ Stanley R. Chesler
STANLEY R. CHESLER
United States District Judge

Dated: June 20, 2016